Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK  99801-1145
Phone:  (907) 586-2751
Fax:  (907) 463-5891
twaldo@earthjustice.org

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Phone: (360) 534-9900
Fax: (360) 534-9909
nlawrence@nrdc.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL,  SIERRA CLUB, THE WILDERNESS SOCIETY, SITKA CONSERVATION SOCIETY, TONGASS CONSERVATION SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. J06-_____ CV ) |
| UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest. | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 702, 706(2)(A); 16 U.S.C. §§ 1604, 539d; 42 U.S.C. § 4332; 33 U.S.C. § 1323)**

**INTRODUCTION**

1.   This action challenges the 1997 Tongass Land Management Plan Revision ("Tongass Plan"), including its Record of Decision and the Environmental Impact Statement (EIS) accompanying it.  This action also challenges the Emerald Bay Timber Sale Record of Decision implementing the Tongass Plan and authorizing logging and road construction in a currently roadless area.

2.   The Tongass Plan allocates about 3.6 million acres of the Tongass National Forest to land use designations that allow logging and roadbuilding, of which about 2.5 million acres are currently undeveloped and roadless.  The Emerald Bay project is located on the Cleveland Peninsula of the mainland, about 40 air miles north of Ketchikan.  The Forest Supervisor for the Tongass, Forrest Cole, signed the Emerald Bay Record of Decision on September 30, 2005, and a notice of availability of the Final Supplemental Environmental Impact Statement was published in the Federal Register on November 18, 2005.

3.   The Emerald Bay Record of Decision authorizes logging on approximately 601 acres of old-growth forest, projected to remove an estimated 16.4 million board feet of timber.  It also authorizes the construction of 6.2 miles of roads.  The logging and associated roadbuilding is authorized to occur entirely within the Cleveland Roadless Area, and 2.2 miles of road will cross an area designated in the Tongass Plan as an "old growth reserve" in which new road construction is generally inconsistent.  Clearcutting is authorized for the majority of the acres approved for logging.  Like other Tongass timber sales, the Emerald Bay sale also approves logging a disproportionate acreage of the highest volume stratum occurring in the Timber Production LUD for the sale area.  These trees are, on average, more valuable economically and

for wildlife than the lower volume strata available for logging in the Tongass Plan. The practice of disproportionately logging the most valuable stands is unsustainable.

4. Tongass roadless areas and the high-value stands of old-growth forest authorized for logging in the Emerald Bay project are important for wildlife, biological diversity, recreation and other natural resource uses. The Tongass Plan and the Emerald Bay timber sale do not adequately protect these resources, and the defendants have failed to consider and disclose adequately the adverse impacts of the plan and the timber sale.

5. The plaintiffs are organizations whose members use the roadless areas of the Tongass, including the Emerald Bay timber sale area, for recreation, subsistence use, sport hunting and fishing, camping, photography, wildlife viewing, and other activities that depend on the natural old-growth forest values. These organizations seek declaratory and injunctive relief preventing the Forest Service from proceeding with actions that cause harm to the environment, and thereby to their members, pending compliance with the law.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

6. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02. Judicial review is available under the Administrative Procedure Act. 5 U.S.C. §§ 701-06.

7. The statute of limitations applicable to this action requires that the action be filed within six years after the right of action first accrued. 28 U.S.C. § 2401(a). This action is filed within six years after the right of action first accrued.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PLAINTIFFS

9.   Southeast Alaska Conservation Council (SEACC) is a nonprofit organization of 18 volunteer conservation groups in fourteen communities across the Southeast Alaska panhandle, from Yakutat to Ketchikan, and over 2000 individual members, the majority of whom live in Alaska.  SEACC advocates the conservation and wise long-term management of the scenic, wilderness, fish, wildlife, recreation, subsistence and other natural resources and values of southeast Alaska and the Tongass National Forest in particular.

10.    The Natural Resources Defense Council (NRDC) is a non-profit organization dedicated to protection of the earth's environment.  NRDC has over 1,800 members in the State of Alaska and more than 650,000 members in all.  NRDC's ongoing conservation and public education efforts involving the Tongass National Forest date back almost to the organization's inception.

11.    The Sierra Club is a national grassroots conservation organization.  The Sierra Club's members are 767,000 Americans, including about 1,800 Alaska residents, who are inspired by nature.  They explore, enjoy, and protect the wild places of the earth including the Tongass National Forest.  They practice and promote the responsible use of the earth's ecosystems and resources.  For over a hundred years they have sought to educate and enlist humanity to protect and restore the quality of the natural and human environment.  In Southeast Alaska the Sierra Club is represented by the Juneau Group of the Sierra Club.  Sierra Club members reside in nearly every community of Southeast Alaska, from Yakutat to Ketchikan, and derive benefits and enjoyment from the natural environment and unlogged areas of the Tongass National Forest.

12.     The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic.  It has approximately 205,000 members nationwide, approximately 700 of whom live in Alaska.

13.     Sitka Conservation Society (SCS) is a non-profit organization based in Sitka, Alaska, with approximately 500 members, most of whom live in Sitka and surrounding areas in southeast Alaska.  SCS is dedicated to conserving the natural environment of the Tongass National Forest.  SCS informs Sitkans and others about activities and decisions that affect the quality of life they derive from the Tongass, advocates for changes in forest laws and policies, advocates for protection of roadless areas on the Tongass, and encourages Sitkans' participation in the public processes related to management of the forest, including the forest plan and timber sales.

14.     Tongass Conservation Society (TCS), based in Ketchikan, Alaska, is dedicated to conserving the biodiversity of the many island forests of the Tongass through protection of habitat and promotion of sustainable use.  TCS strives to nourish an attitude of responsible stewardship and to enable the community at large to become more active and informed.  TCS is a non-profit organization with over 300 members, the majority of whom live in southeast Alaska.

15.     The Center for Biological Diversity (the Center) is a non-profit organization based in Tucson, Arizona.  The Center works to protect wild places and their inhabitants.  The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  It has been actively involved in protecting Alaska's wildlife since the early 1990's.  With regard to the Tongass National Forest, the Center has filed petitions to protect the Queen Charlotte goshawk and the Alexander Archipelago wolf under the

Endangered Species Act.  The Center is still involved in active litigation over the fate of the

goshawk, and carefully follows the fate of many other species that depend upon Tongass

wildlands.  The Center has about 15,000 members including some who live in Southeast Alaska.

16.     The plaintiffs participate actively in the administrative processes established for

management of the Tongass.  Various of the plaintiff groups have submitted comments on

proposed actions and draft EISs for the Tongass Plan and for the Emerald Bay timber sale.

Various of these groups also have filed administrative appeals (including interventions and

interested party comments) of the Tongass Plan and of the 2005 Record of Decision for the

Emerald Bay timber sale.  The plaintiffs have exhausted administrative remedies for the

decisions challenged in this complaint.

17.     Members of plaintiff organizations reside near, visit, or otherwise use and enjoy

the Tongass National Forest, including the Emerald Bay project area.  In particular, members of

plaintiff organizations use these areas for recreation, subsistence use, sport hunting and fishing,

wildlife viewing, photography and education, and aesthetic and spiritual enjoyment.  The

plaintiffs and their members derive subsistence, cultural, scientific, recreational, aesthetic, and

conservation benefits and enjoyment from these areas.  The logging authorized in the Emerald

Bay timber sale will directly and irreparably injure these interests.

18.     The plaintiff organizations monitor the use of forest ecosystems and compliance

with the laws respecting these ecosystems, educate their members and the public concerning

management of these ecosystems, and advocate policies and practices that conserve the natural

value of these ecosystems.  It is impossible to achieve these organizational purposes fully

without adequate information and public participation in the processes required by law.  The

interests and organizational purposes of the plaintiffs are directly and irreparably injured by
defendants' violations of the laws as described in this complaint.


## DEFENDANTS

19.     The full name of Defendant United States Forest Service is United States
Department of Agriculture, Forest Service.  It is an agency of the Department of Agriculture
charged with the administration of the national forests, including the Tongass.

20.     Defendant United States Department of Agriculture is the department of the
executive branch responsible for overseeing the activities of the Forest Service.

21.     Mark Rey is sued in his official capacity as the Under Secretary, Natural
Resources and Environment, United States Department of Agriculture

22.     Defendant Dennis E. Bschor is sued in his official capacity as Regional Forester
for Forest Service Region 10, which includes all of the Tongass National Forest.

23.     Defendant Forrest Cole is sued in his official capacity as the Forest Supervisor for
the Tongass National Forest.


## FACTS

Planning Process

24.     The Tongass National Forest in Southeast Alaska is this country's largest
National Forest.  The Tongass contains the largest remaining expanse of unaltered coastal
temperate rainforest ecosystem in the world.

25.     The National Forest Management Act (NFMA) requires the Forest Service to
prepare and revise land and resource management plans for national forests.  16 U.S.C. § 1604.

In May 1997, after a lengthy planning process, the Alaska Regional Forester signed and published a Record of Decision (ROD) for the Tongass Land Management Plan Revision.  At that time, the Forest Service also published the revised Land and Resource Management Plan for the Tongass National Forest and its associated Final EIS (FEIS).

26.    The 1997 Tongass Plan established a maximum allowable sale quantity (ASQ) of 2.67 billion board-feet per decade, which is equivalent to an annual average of 267 million board-feet (mmbf) per year.

27.    Numerous groups and individuals filed administrative appeals of the Regional Forester's May 1997 decision.

28.    In April 1999, Under Secretary James Lyons resolved all administrative appeals and issued a new ROD for implementation of the Tongass Land Management Plan.  The 1999 ROD modified the 1997 ROD by reducing the ASQ to 1.87 billion board-feet per decade, which is equivalent to an annual average of 187 million board-feet per year.  The 1999 ROD also identified 18 areas of special interest, mostly in roadless areas.  The 1997 Tongass Plan had assigned these areas to land use designations that allowed logging.  The 1999 ROD changed them to new designations that generally prohibit timber sales.  The 1999 ROD also adopted new standards and guidelines to provide additional protection for wildlife.

29.    On March 31, 2001, the court vacated the 1999 ROD in *Alaska Forest Association, et al., v. United States Department of Agriculture, et al.*, No. J99-0013 CV (JKS) (D. Alaska).  The court also enjoined the Forest Service from implementing the 1999 ROD and ordered the Forest Service to prepare a supplemental EIS addressing the changes from the 1997 Tongass Plan.  However, the Forest Service never prepared a supplemental EIS to address those

proposed changes.  Instead, the agency has chosen to implement the 1997 Tongass Plan without the changes adopted by Under Secretary Lyons.

30.    In a decision dated August 5, 2005, the Ninth Circuit Court of Appeals held that the 1997 ROD adopting the Tongass Plan was arbitrary due to a substantial error in estimating market demand for timber and that the FEIS prepared for the Plan was misleading, failed to consider an adequate range of alternatives, and failed to disclose significant environmental impacts of the Plan in violation of the National Environmental Policy Act (NEPA).

31.    The Forest Service has implemented the 1997 Tongass Plan with numerous decisions to authorize new timber sales, including the Emerald Bay Record of Decision.  Timber sale offerings approved under the 1997 Tongass Plan have caused and are projected to cause adverse impacts to wildlife and other resources including visual quality, roadless recreation, subsistence use, and sport hunting.


High Value Old Growth, Wildlife, and Roadless Areas

32.    High volume stands, characterized in part by the presence of large trees and having special significance as wildlife habitat, are a relatively scarce resource in Southeast Alaska.  They have been disproportionately targeted for logging by the Forest Service and on lands adjacent to the Tongass by others, in an unsustainable and harmful practice known as "highgrading."

33.    Concerns over highgrading led Congress in 1990 to adopt protections for high volume stands.

34.    The Tongass Plan FEIS did not include information then available to the Forest Service about the occurrence, significance, and scarcity of high volume class forest stands in

Southeast Alaska, the reduction in their numbers throughout the region by logging, and the likely impact of the FEIS alternatives on such stands and their associated values.

35.     The Tongass Plan FEIS analyzed the impacts of the various alternatives on forest "volume strata." In so doing, the FEIS did not include information then available to the Forest Service about the original proportion of high strata stands in the region and their disproportionate loss to logging over time.

36.     The Tongass Plan FEIS analyzed the impacts of alternatives on volume strata on the assumption that each stratum would be logged in proportion to its occurrence on the Tongass.

37.     The Tongass Plan does not prohibit highgrading, or disproportionate logging, of large tree stands, whether characterized as high volume strata or high volume classes. For the first decade of the Tongass Plan, the Forest Service planned to log a disproportionate amount of high volume timber. The Forest Service has stated that, under the Tongass Plan, "there is a disproportionate amount of harvesting planned within high-volume low-elevation stands – areas that also provide critical wildlife habitat and are the most valuable to several species of concern…."

38.     Since the Tongass Plan was adopted, the Forest Service has continued to highgrade Tongass timber.

39.     The Emerald Bay EIS does not contain information or analyses that adequately reveal the past history, significance, and impacts of highgrading.

40.     Scientists involved in developing and reviewing the wildlife conservation strategy for the Tongass Plan recommended that the Forest Service prohibit logging in the remaining large blocks of unfragmented old-growth forest in the Tongass. Public comments on the 1996 Revised Supplemental Draft EIS (RSDEIS) requested that the Forest Service develop one or

more alternatives that actively provided timber for industrial use but scheduled logging focused

outside of the remaining blocks of undeveloped old growth watersheds.  The Forest Service did

not consider such an alternative.

41.    The Emerald Bay project will log and build roads in habitat for wildlife species

that are associated with old-growth forests and undisturbed areas, including but not limited to

American marten, Queen Charlotte goshawk, and Alexander Archipelago wolves.

42.    The logging and road construction authorized in the Emerald Bay project will

adversely affect wildlife that utilize the Emerald Bay project area.

43.    In an effort to maintain the local viability of wildlife populations that occur in the

Emerald Bay project area, the Forest Service relied on application of management standards in

the 1997 Tongass Plan.

44.    The Forest Service lacked an adequate basis for its conclusion that the 1997

Tongass Plan wildlife management standards would ensure the population viability of wildlife

species, including those found in the Emerald Bay project area.

45.    The wildlife management standards in the 1997 Tongass Plan do not ensure the

population viability of wildlife found in the Emerald Bay project area, including but not limited

to American marten, Queen Charlotte goshawk, and Alexander Archipelago wolves.

46.    The Forest Service plans to complete the "Pt. Warde/Frosty/Sunny Bay EIS" in or

about FY 2009.  The Forest Service plans to offer the Sunny Bay timber sale in or about

FY 2011.  Sunny Bay is located a few miles to the northeast of the Emerald Bay project area.

The Forest Service anticipates that this sale will be about 20 mmbf.  This sale, together with the

Emerald Bay sale and other reasonably foreseeable actions, would cause cumulative impacts to

the environment.

Clearcutting

47.     Clearcutting is and has been the most commonly used logging method on the Tongass National Forest.

48.     Clearcutting results in substantial harm to wildlife, scenery, recreation, subsistence, and other natural resource values.

49.     The Forest Service prescribed clearcutting for a majority of the acres approved for logging in the Emerald Bay project.

50.     The Forest Service's stated justifications for approving clearcutting as a logging method in the Emerald Bay project included:  (1) minimizing the spread of dwarf mistletoe, *Arcenthobium tsugense*, a common, naturally occurring parasite of western hemlock; (2) preventing financial losses by salvaging expected mortality caused by Alaska Yellow-cedar decline; (3) rehabilitating past porcupine stem damage; (4) rehabilitating stem decay; (5) minimizing windthrow; and (6) minimizing other physical damage.

51.     Dwarf mistletoe, Alaska Yellow-cedar decline, porcupine stem damage, stem decay, windthrow, and other physical damage to trees all occur naturally in the Emerald Bay project area.  They are part of the natural ecological function of the area.  They do not impair the natural ecological function of the area.  However, they do impair productivity for production of timber.


Tongass Plan Market Demand Analysis

52.     In making his decision adopting the 1997 Tongass Plan, the Alaska Regional Forester used a draft report projecting market demand prepared by Pacific Northwest Station

economists Brooks and Haynes ("Timber Products Output and Timber Harvests in Alaska: Projections for 1997-2010" (Brooks and Haynes, May 15, 1997)). This draft report projected annual average derived demand for timber ranging from a low scenario of 68 mmbf/year to a high scenario of 154 mmbf/year over the ten years immediately following the plan.

53.    The 1997 ROD states that the demand projections contained in that draft Brooks and Haynes report are "for sawlogs suitable for producing lumber in Southeast Alaska mills."

54.    This statement is incorrect. In fact, the projections encompass both sawlogs and utility logs.

55.    This error led to an assumption in the Tongass Plan ROD that an annual logging level of between 130 mmbf and 296 mmbf would be needed to satisfy the projections in the May 15 Brooks and Haynes draft.

56.    In adopting the Tongass Plan, the Regional Forester asserted that he was, among other things, seeking to provide sufficient timber to meet market demand for the planning cycle, under 16 U.S.C. § 539d.

57.    The erroneous interpretation of the May 15 Brooks and Haynes draft caused the Regional Forester to authorize a supply of timber that was significantly higher than the actual Brooks and Haynes projections.

58.    In so doing, the Forest Service allocated significantly more land for timber production than was necessary to meet the Brooks and Haynes projected market demand. Logging and road construction on these lands causes harm to wildlife, recreation, subsistence, and other multiple use objectives.

Actual Market Demand

59.    Beginning in the 1950s, the United States annually sold large volumes of timber to the Ketchikan Pulp Company (KPC) and Alaska Pulp Company (APC), and their predecessors, pursuant to 50-year contracts intended to facilitate construction and operation of two large pulp mills.

60.    APC ceased operation of its Sitka pulp mill in 1993, and the Forest Service terminated its long-term contract in 1994.  APC removed 92 mmbf of Tongass timber in federal Fiscal Year (FY) 1994 and 16 mmbf in FY 1995.  It has logged no timber from the Tongass since, except a small amount of residual timber (less than one mmbf) in FY 1996.

61.    KPC ceased operation of its Ketchikan pulp mill in 1997.  To resolve legal claims, the United States, KPC, and Louisiana-Pacific Corporation entered a Settlement Agreement in 1997.  The Settlement Agreement canceled the contract.  The United States agreed to pay KPC approximately $135 million and to make 300 mmbf of Tongass timber available to KPC for cutting in 1997, 1998, and 1999.  KPC dropped its claims and agreed to cut this timber and keep its sawmills operating.  In 1999, the Settlement Agreement was extended to grant one more year to cut the remaining timber, to provide start-up timber for a proposed new veneer mill.

62.    In attempting to meet market demand for Tongass timber, the Forest Service forecasts demand using, in part, estimates derived from the final 1997 Brooks and Haynes report, published shortly after the 1997 Tongass Plan.  The report is entitled "Timber Products Output and Timber Harvest in Alaska: Projections for FY97-10" (Brooks and Haynes; PNW-GTR-409, September, 1997).

63.    The final 1997 Brooks and Haynes demand projections are an integral component of the formula developed in the 2000 report entitled "Responding to the Demand for Tongass

Timber:  Using Adaptive Management to Implement Sec. 101 of the 1990 Tongass Timber

Reform Act."  This formula is used annually by the Forest Service to help determine the volume

of timber to offer each year.

64.    The Forest Service relies explicitly on the final 1997 Brooks and Haynes

projections in describing the demand for Tongass timber in the Final EIS for the Emerald Bay

timber sale.

65.    The historical data on which the 1997 demand predictions are based include

volume cut pursuant to the two long-term pulp mill contracts.

66.    From the start of the long-term contracts until and including FY 2000, the long-

term contracts, including the KPC settlement and extension, accounted for the large majority of

the timber cut in the Tongass.

67.    The timber logged from the Tongass between 1997 and 2000 included significant

volume provided by the KPC Settlement Agreement and the one-year extension thereof.  In

FY 1997, KPC removed approximately 69 mmbf.  In FY 1998, KPC removed approximately

80 mmbf.  In FY 1999, approximately 87 mmbf was removed under the Settlement Agreement.

In FY 2000, approximately 80 mmbf was removed under the Settlement Agreement as extended.

These operations were completed in FY 2001 with removal of the last 2.5 mmbf under the

agreements.  No Tongass timber has been cut pursuant to KPC's 50-year contract, the Settlement

Agreement, or the extension since FY 2001.

68.    Annual timber volume cut on the Tongass since the end of the long-term contracts

and KPC Settlement Agreement, as extended, has been significantly lower than the 1997 demand

predictions.  From FY 1996 to FY 2000, as KPC was finishing out its contract, the logging

volume on the Tongass averaged approximately 130 mmbf per fiscal year.  In FY 2001 and

FY 2002 the volume logged on the Tongass was approximately 48 mmbf and 34 mmbf respectively. The volume logged in FY 2003 was approximately 51 mmbf. The FY 2003 total included approximately 16 mmbf cleared for the Southeast electrical intertie on behalf of Ketchikan Public Utilities. In FY 2004, the volume logged on the Tongass was approximately 46 mmbf. In FY 2005 the volume logged on the Tongass was approximately 50 mmbf.

69.     The average volume logged per year on the Tongass from FY 2001 to FY 2005 was 46 mmbf. There is sufficient timber volume in Tongass land use designations where logging is permitted to allow logging of 46 mmbf or more per year over the long-term without logging in Inventoried Roadless Areas.

70.     The 1997 demand predictions are predicated in part on the assumption that a market would develop for low-grade saw logs, utility logs, and manufacturing residue to fill the niche left by the closure of the pulp mills. Such a market has not arisen.

71.     The Forest Service has recognized that there were already significant differences between the assumptions underlying Brooks and Haynes' 1997 projections and actual conditions in 2000.

72.     Brooks and Haynes estimated that North America's share of Japanese softwood lumber imports would range from 70 to 76 percent, depending on their scenario.

73.     North America accounted for just 61 percent of Japanese softwood lumber imports in 1999.

74.     There is no current market for chipped Tongass logs.

75.     The loss of the market for wood chips has important implications for the economic viability of timber sales on the Tongass. There has been an increase in applications to export low grade round Sitka spruce and hemlock logs cut from the Tongass.

76.     The veneer plant constructed by Gateway Forest Products in Ketchikan operated for approximately 9-10 months before ceasing production in December 2001, notwithstanding public assistance in financing the mill and providing startup timber for it.

77.     The changes in demand and prices have had negative effects on the Southeast Alaska timber industry and the profitability of the remaining facilities.

78.     Since the end of the KPC Settlement Agreement, as extended, two major Southeast Alaska wood products companies – Gateway Forest Products, Inc. and Silver Bay Logging, Inc. – have filed for bankruptcy protection.

79.     Gateway Forest Products has ceased operation and the majority of its assets have been liquidated.

80.     From FY 1998 to FY 2002, the Forest Service made about 263 timber sale offerings on the Tongass.

81.     Of the sale offerings in this time period, about 75 received no bids.  About 139 received only one bid.  About 49 received multiple bids.

82.     In FY03, the Forest Service made about 44 timber sale offerings on the Tongass.

83.     Of the sale offerings in FY03, about 25 received one bid.  About 14 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

84.     In 2003, Gateway Forest Products and the Forest Service entered into an agreement canceling the nine timber sales it had under contract with a total volume of approximately 108 mmbf.

85.     The Brooks and Haynes demand projections for the planning cycle have not been updated since 1997.

86.    In section 339 of the Department of the Interior and Related Agencies Appropriations Act, 2004, Congress authorized the Forest Service to cancel by mutual consent certain Tongass timber sale contracts.  Pub. L. No. 108-108, Title III, § 339, 117 Stat. 1241, 1314 (2003).  Under this provision, the Forest Service offered to cancel 20 timber sales then under contract.  All of these sales were originally awarded between October 1, 1995 and January 1, 2002.  They contained about 138 mmbf of remaining volume.  The offers were based on a Forest Service finding that all 20 sales were "uneconomical" under current timber markets.  The Forest Service further found that it was highly unlikely that markets would improve enough for these sales to become economical during the life of the timber sale contract.

87.    The Forest Service cancelled 17 sales under the authority of section 339.  These sales had a combined volume of approximately 122 mmbf.


Timber Sale Losses

88.    Each year, the Forest Service spends tens of millions of dollars administering the Tongass timber sale program.

89.    The Forest Service keeps detailed records of the money it shows as spent each year on the timber sale program.  Some of that information is made available to the public as part of the annual monitoring reports.

90.    In FY 1999, the Forest Service spent $19,842,546 on "timber management," $7,685,131 on "timber road construction," more than $5 million on "general administration," and more than $3 million on "ecosystem planning, inventorying, and monitoring."

91.    In FY 2000, the Forest Service spent $14,524,473 on "timber management," more than $3 million each on "road construction" and "road maintenance, nearly $4 million on

"general administration," and more than $1 million on "ecosystem planning, inventorying, and monitoring."

92.     In FY 2001, the Forest Service spent $21,192,221 on "timber management," more than $13 million on "roads" and more than $2 million on "ecosystem planning, inventorying, and monitoring."

93.     In FY 2002, the Forest Service spent $17,9234,470 on "timber management," more than $15 million on "roads" and more than $3 million on "ecosystem planning, inventorying, and monitoring."

94.     In FY 1999, income to the Forest Service for timber sold from the Tongass totaled approximately $5,456,000.  In FY 2000, income from timber sold from the Tongass totaled approximately $5,582,000.  That number declined to approximately $1,855,000 in FY 2001 and approximately $1,242,000 in FY 2002.  In FY 2003, income to the Forest Service for timber sold from the Tongass totaled approximately $1,464,000.

95.     These costs, and the associated losses, were not discussed during the NEPA process for the Emerald Bay timber sale.

96.     Instead, the discussion of "public investment" in the Emerald Bay FEIS simply cites outdated and incomplete "budget allocation costs and management expenses" as estimates of the costs incurred by the Forest Service.  The budget estimates do not reflect accurately the costs borne by the Forest Service in planning and implementing the Emerald Bay timber sale project.

97.     The Forest Service itself has recognized in its annual monitoring reports that these numbers are inaccurate and should be revised.

98.     Accordingly, the evaluation of the "public investment" necessary to plan and implement the Emerald Bay sale is incomplete and misleading, and does not accurately reflect the actual costs incurred by the Forest Service and taxpayers.

COUNT I

Miscalculation of Market Demand in the Tongass Plan

(National Forest Management Act, Tongass Timber Reform Act,

National Environmental Policy Act, Administrative Procedure Act)

99.     The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

100.     The National Forest Management Act requires the Forest Service to prepare a land management plan for each national forest.  16 U.S.C. § 1604.

101.     The NFMA specifies that each management plan shall:

   (1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528-531), and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

   (2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section ….

16 U.S.C. § 1604(e).

102.     The Tongass Timber Reform Act exhorts the Forest Service to "seek" to provide enough timber to meet market demand, subject to all applicable laws and "to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources."  16 U.S.C. § 539d.

103.    NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .." 42 U.S.C. § 4332(C).

104.    The presentation of incomplete or misleading information in an EIS violates NEPA.

105.    The Record of Decision for the Tongass Plan is the formal decision document setting forth the Regional Forester's rationale for adopting the plan.  40 C.F.R. § 1505.2.

106.    In explaining the basis for the Allowable Sale Quantity of timber that may be cut under the Tongass Plan, the Forest Service made an error in projecting market demand for timber.  The Record of Decision nearly doubles the actual projections.  The market demand projection influenced the amount of land to be made available for logging.  The result was a plan that allowed logging up to an average of 267 mmbf/year, while the demand projection for the highest market scenario was an average of 154 mmbf/year.  More likely medium and low market scenarios had lower demand projections.

107.    In making this error, the Forest Service allowed logging in areas that would cause unnecessary harm to other multiple use objectives, such as wildlife and recreation.

108.    The 1997 Tongass Plan FEIS makes the same error in reporting projected market demand and harvest levels.  The FEIS also uses the same error to predict employment and income levels under the various alternatives.  The result is that the FEIS presents false and misleading data regarding the likely amount of logging and predicted economic benefits of the proposed action and alternatives.

109.    Under the Administrative Procedure Act, the Court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law …."  5 U.S.C. § 706(2)(A).

110.    In adopting the Tongass Plan based on a significant error projecting market demand, and in implementing the Plan in the Emerald Bay timber sale project, the Forest Service acted arbitrarily and in violation of its obligations under the National Forest Management Act and the Tongass Timber Reform Act.

111.    The 1997 Tongass Plan FEIS violates NEPA by presenting false and misleading information about projected market demand, logging levels, and economic effects.


COUNT II

Inadequate Alternatives in Tongass Plan FEIS

(National Environmental Policy Act)

112.    The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

113.    In formulating and implementing the Tongass Plan, the Forest Service was required by NEPA to provide "detailed statement[s] on … alternatives to [its] proposed action[s]," 42 U.S.C. § 4332(C)(iii), and to "study, develop, and describe appropriate alternatives to [its] recommended courses of action."  42 U.S.C. § 4332(E).

114.    White House Council on Environmental Quality ("CEQ") regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives" to the agency's proposal.  40 C.F.R. § 1502.14(a).

115.    Managing the Tongass by preventing logging in the existing large blocks of old growth, including undeveloped watersheds, is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.  This fact is shown by recommendations from scientists and the public that the Forest Service adopt that approach, and by the fact that the agency itself did eventually adopt it for a time by deciding to protect remaining roadless areas on the Tongass.

116.    All of the alternatives in the 1997 FEIS, except Alternative 1, would allow logging at levels in excess of the medium scenario projected by Brooks and Haynes in their May 15, 1997 report.

117.    Managing the Tongass to allow a timber sale program that more closely approximated the actual and likely demand for timber as projected by Brooks and Haynes is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.

118.    The Forest Service's failure in the Tongass Plan FEIS to study, develop, describe, rigorously explore, and/or evaluate the alternative of maintaining an active logging program restricted to trees outside of the existing large blocks of old growth, including undeveloped watersheds, violated 42 U.S.C. §§ 4332(C) and (E) and 40 C.F.R. § 1502.14(a).


COUNT III

Failure to Disclose Highgrading

(National Environmental Policy Act)

119.    The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

120.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by NEPA to identify "the environmental impact of [its] proposed action." 42 U.S.C. § 4332(C)(i).

121.    White House CEQ regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall discuss "the environmental effects of alternatives," including "[d]irect effects and their significance" and those that "are caused by the action and … reasonably foreseeable." 40 C.F.R. §§ 1502.16 & 1508.8.

122.    The Forest Service violated 42 U.S.C. § 4332(C) and 40 C.F.R. §§ 1502.16 and 1508.8 by failing to include in the Emerald Bay FEIS and in the Tongass Plan EIS information available to it about high volume stands, about the history and significance of past highgrading, about reasonably foreseeable future highgrading, and about the possible impacts and significance of highgrading by volume class, volume strata, and/or tree species.

COUNT IV

Action Lacking Adequate Program EIS

(National Environmental Policy Act)

123.    The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

124.    While a federal agency is preparing a program EIS, regulations implementing NEPA prohibit the agency from undertaking major federal actions that would tend to prejudice the ultimate decision on the program, unless a program EIS is already in place. 40 C.F.R. § 1506.1(c).

125.    The FEIS for the 1997 Tongass Plan is a program EIS.

126.     The Emerald Bay project decision is a site-specific major federal action, covered by and implementing the 1997 Tongass Plan, that may significantly affect the quality of the human environment.

127.     The Ninth Circuit Court of Appeals has held that the FEIS for the 1997 Tongass Plan does not comply with NEPA.

128.     The Forest Service is currently, and was at the time of the adoption of the Emerald Bay Record of Decision, in the progress of work on a new program EIS for the Tongass National Forest to correct the deficiencies identified by the court.

129.     The Emerald Bay project tends to prejudice the ultimate decision on the new program EIS by determining subsequent development and limiting alternatives.

130.     The adoption of the Record of Decision for the Emerald Bay project in the absence of an adequate program EIS for the Tongass, while work on a new program EIS was in progress, violated NEPA.  40 C.F.R. § 1506.1(c).


COUNT V

Misleading Presentation of Market Demand

(National Environmental Policy Act)

131.     The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

132.     NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .."  42 U.S.C. § 4332(C).

133.     The presentation of incomplete or misleading information in an EIS violates NEPA.

134.     The information about market demand for timber contained in the Emerald Bay FEIS is both incomplete and misleading.  In the FEIS, the Forest Service relied on outdated market demand projections to justify the projects.  The FEIS failed to present the public and decisionmaker with relevant, accurate information known to the Forest Service about market conditions.

135.     The false, incomplete and misleading information in the Emerald Bay EIS violates NEPA.


COUNT VI

Public Investment Analysis

(National Environmental Policy Act)

136.     The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

137.     NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .."  42 U.S.C. § 4332(C).

138.     The presentation of incomplete or misleading information in an EIS violates NEPA.

139.     The "Public Investment" analysis contained in the Emerald Bay FEIS is incomplete and misleading because it does not reflect current cost information collected annually

by the Forest Service.  Actual costs are significantly higher than reported in the FEIS.  The

agency and the public will bear significant losses on the project not disclosed in the FEIS.

140.    The failures to present accurate information on public investment mislead and fail

to inform the public and decisionmaker and thereby violate NEPA.


COUNT VII

Cumulative Impacts

(National Environmental Policy Act)

141.    The plaintiffs repeat and incorporate by reference the allegations of the preceding

paragraphs.

142.    NEPA requires that an EIS include an assessment of the cumulative impacts of

the proposed action together with the impacts of past, present, and reasonably foreseeable

activities.  40 C.F.R. § 1508.7.

143.    The Emerald Bay FEIS fails to provide an adequate assessment of the cumulative

effects of past, present, and reasonably foreseeable future actions in the vicinity of Emerald Bay,

including the Sunny Bay timber sale.

144.    The Forest Service's decision to proceed with the Emerald Bay timber sale project

in the absence of an adequate analysis of cumulative impacts to the environment violated NEPA,

42 U.S.C. § 4332(C), and 40 C.F.R. §§ 1502.16, 1508.7 & 1508.8.

COUNT VIII

<u>Clearcutting</u>

<u>(National Forest Management Act)</u>

145.    The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

146.    NFMA provides that the Forest Service cannot select a logging method "primarily because it will give the greatest dollar return or the greatest unit output of timber."  16 U.S.C. § 1604(g)(3)(E)(iv).

147.    The Forest Service authorized clearcutting in the Emerald Bay project.

148.    The reasons stated by the Forest Service to justify clearcutting in the Emerald Bay project relate primarily to obtaining the greatest dollar return or the greatest output of timber, in violation of NFMA.

COUNT IX

<u>Violations of State Water Quality Standards</u>

<u>(Clean Water Act)</u>

149.    The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

150.    Section 313(a) of the Clean Water Act requires that all federal agencies "engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants," must comply with the Clean Water Act's requirements, including limits imposed by states through the Act.  33 U.S.C. § 1323(a).

151.    Forest Service studies and monitoring reports show that road construction like that associated with the Emerald Bay timber sale will likely violate Alaska Water Quality Standards for sediment and turbidity, Alaska Admin. Code tit. 18, §§ 70.020(b)(9) & (12), 70.050, in violation of section 313(a) of the Clean Water Act.


COUNT X

Failure to Ensure Wildlife Viability

(National Forest Management Act)

152.    The plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

153.    The National Forest Management Act (NFMA) requires the Forest Service to adopt regulations for national forest planning.  16 U.S.C. § 1604.

154.    In formulating and adopting the Tongass Plan, the Forest Service was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.19 (2000), to manage fish and wildlife habitat "to maintain viable populations of existing native and desired non-native vertebrate species" found on the Tongass.

155.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.27 (2000), to "[p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species."

156.    For planning purposes, the Forest Service defined a "viable population" in 36 C.F.R. § 219.19 (2000) as "one which has the estimated numbers and distribution of

reproductive individuals to insure its continued existence is well distributed in the planning area."

157.    In adopting the Tongass Plan and deciding to implement it through the Emerald Bay timber sale project decision, the Forest Service failed to ensure the population viability of vertebrate species in violation of 36 C.F.R. §§ 219.19 & 219.27 (2000).


**PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request that the Court:

1.  Enter a declaratory judgment that:

        a.  the decision adopting the 1997 Tongass Plan was arbitrary, because it was based on a significant error in projecting market demand;

        b.  the FEIS for the Tongass Plan violates NEPA by disclosing erroneous information about projected market demand and resulting economic impacts;

        c.  the FEIS for the Tongass Plan violates NEPA by failing to consider reasonable alternatives to protect more large blocks of old growth, including undeveloped watersheds, and important high value stands;

        d.  the FEIS for the Emerald Bay project and for the Tongass Plan fail adequately to disclose the practice of highgrading and its adverse impacts in violation of NEPA;

        e.  the adoption of the Record of Decision for the Emerald Bay project in the absence of an adequate program EIS for the Tongass, while work on a new program EIS was in progress, violated NEPA;

f.  the FEIS for the Emerald Bay project violates NEPA by presenting false, incomplete and misleading information about market demand for timber and resulting economic effects;

g.  the FEIS for the Emerald Bay project violates NEPA by presenting false and misleading information about the costs to the public of the timber sale;

h.  the FEIS for the Emerald Bay project violates NEPA by failing to disclose the cumulative impacts of the project together with other past, present, and reasonably foreseeable future actions;

i.  the findings made by the Forest Service to justify clearcutting as a logging method in the Emerald Bay project violate the NFMA requirement that a harvesting system may not be selected primarily because it will give the greatest dollar return or the greatest unit output of timber;

j.  the Forest Service's decision to authorize the Emerald Bay project violates the Clean Water Act, because the project will cause violations of the state water quality standards for sediment and turbidity; and

k.  the Forest Service violated the requirement in its NFMA regulations to ensure minimum viable populations of wildlife well-distributed across the Forest.

2.  Enter appropriate injunctive relief;

3.  Award plaintiffs the costs of this action, including reasonable attorneys' fees; and

4.  Grant such other relief as this Court deems just and proper.

Respectfully submitted this 23rd day of March 2006,

/s/ Thomas S. Waldo

Thomas S. Waldo (ABA# 9007047)
Eric P. Jorgensen (ABA# 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

Attorneys for Plaintiffs